## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| **SANDRA BAKER,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **v.** | |
| **PROGRESSIVE DIRECT INSURANCE COMPANY, DOES I-V, and ROE CORPORATIONS VI-X, inclusive,** | **Case No. 2:21-cv-00307-JCB** |
| **Defendants.** | **Magistrate Judge Jared C. Bennett** |

Under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, all parties have consented to Judge

Jared C. Bennett conducting all proceedings in this case, including entry of final judgment.[1]

Defendant Progressive Direct Insurance Company ("Progressive") filed a motion for partial

summary judgment regarding Plaintiff Sandra Baker's ("Ms. Baker") third and fourth causes of

action (i.e., breach of the implied covenant of good faith and fair dealing).[2] The court carefully

reviewed the parties' respective memoranda and their accompanying exhibits. The court also

considered the points that the parties' counsel presented at oral argument on February 6, 2023.[3]

Now being fully advised, the court grants Progressive's motion and dismisses with prejudice Ms.

Baker's third and fourth causes of action.

---

[1] ECF No. 9.

[2] ECF No. 29.

[3] ECF No. 39.

**UNDISPUTED FACTS**

On September 4, 2020, a drunk driver hit the car in which Ms. Baker was an occupant[4] and caused Ms. Baker to suffer some injuries.[5] After filing an insurance claim, Ms. Baker settled with the drunk driver's insurance company for policy limits at $100,000.[6]

Ms. Baker held an insurance policy of her own with Progressive that provided Personal Injury Protection ("PIP") and Underinsured Motorist benefits ("UIM").[7] Progressive paid Ms. Baker $3,000 in her PIP benefits after the accident.[8] On January 18, 2021, Ms. Baker filed a claim for UIM benefits with Progressive for the policy's limit, which was $100,000.[9] The claim alleged that Ms. Baker had suffered injuries requiring medical treatment beyond what the $103,000 in prior compensation would cover.[10] Among these treatments was a surgery that Physician Assistant Thomas Cureton ("Mr. Cureton") recommended.[11]

On February 2, 2021, Jeremy Rasmussen ("Mr. Rasmussen") from Progressive initially evaluated Ms. Baker's claim for UIM benefits.[12] A few hours later, another insurance adjuster "re-triag[ed]" the claim with another claims specialist, Debra Silva ("Ms. Silva"), because Ms.

---

[4] ECF No. 29-2.

[5] ECF No. 29-3 at 1-2 of 3.

[6] ECF No. 29-1 at 2 of 4.

[7] ECF No. 31-4 at 11-20 of 36.

[8] ECF No. 29-4 at 25 of 43 (stating, "We have exhausted PIP for [Ms. Baker]," and showing that $3,000 was paid in PIP benefits).

[9] ECF No. 29-3 at 2 of 3.

[10] ECF No. 29-3 at 1-2 of 3.

[11] ECF No. 29-3 at 2 of 3.

[12] ECF No. 29-4 at 26 of 43.

Baker's surgery recommendation was from Mr. Cureton, who was not a medical doctor.[13] Progressive stated at oral argument that Ms. Silva is not medically trained.

      In her evaluation of Ms. Baker's claim, Ms. Silva disregarded Mr. Cureton's surgical recommendation because "he is prohibited under [Utah] law from billing under his own name"[14] and cannot make a surgical recommendation without the supervision of a medical doctor.[15] Other notes from Ms. Silva indicate that Mr. Cureton was not under the supervision of a medical doctor, that no medical provider referred Ms. Baker to Mr. Cureton, and that Mr. Cureton has previously testified in depositions that "lien funding companies refer his patients."[16] Also, Ms. Silva stated that because Mr. Cureton could not bill under his own name under Utah law, Ms. Silva was not considering Mr. Cureton's bills.[17]

      Additionally, Ms. Silva reviewed the bills from Ms. Baker's chiropractor. Similar to Mr. Cureton's referred patients, Ms. Silva noted that Ms. Baker's chiropractor visits were billed to the "Surgical Lien Funding Co[mpany]" and that the chiropractor's bills were "very high" for four office visits.[18] Additionally, Ms. Silva found it odd that Ms. Baker's shoulder did not begin

---

[13] ECF No. 29-4 at 29 of 43.

[14] ECF No. 29-4 at 30 of 43.

[15] ECF No. 29-4 at 31 of 43.

[16] ECF No. 29-4 at 31 of 43.

[17] ECF No. 29-4 at 32 of 43.

[18] ECF No. 29-4 at 30 of 43.

to hurt until seven days after the accident.[19] Ms. Silva also entirely discounted the chiropractor's

25% disability rating of Ms. Baker because the chiropractor is not a medical doctor.[20]

Ms. Silva also questioned why Dr. Sonnenberg placed Ms. Baker in a walking boot and

whether Dr. Sonnenberg or his Physician Assistant actually examined Ms. Baker, especially

when another medical doctor later said that the x-rays did not show a fracture necessitating a

walking boot.[21] Ms. Silva noted that Dr. Sonnenberg "is almost exclusively seen in at[torney]

rep[resentation]-referral cases in [Utah]."[22] As to the physician who told Ms. Baker she did not

need a walking boot, he charged $1,000 for that office visit, which was billed to a "Lien Funding

Co.," which Ms. Silva found problematic.[23]

Given the participation of Mr. Cureton, Dr. Sonnenberg's way of obtaining patients, and

the influence of the "Lien Funding Co.," Ms. Baker's claim was referred to Progressive's Special

Investigation Unit.[24] The Special Investigation Unit noted that it needed to rule out whether Mr.

Cureton could make surgical recommendations without a physician and whether Dr.

Sonnenberg's company was falsifying records.[25] Based on this analysis, among other things, Ms.

---

[19] ECF No. 29-4 at 30 of 43.

[20] ECF No. 29-4 at 31 of 43.

[21] ECF No. 29-4 at 31 of 43.

[22] ECF No. 29-4 at 32 of 43. Progressive's claim notes are generously peppered with abbreviated terms that the court is sure are meaningful in the language that Progressive claims specialists speak. If these notes are to be submitted at trial or in future motions, the court requests a glossary that will help both the judge and the jury translate "Progressive-ese" into plain English. Because the court is certainly not fluent in this language, it will do the best it can based on the context of the entry.

[23] ECF No. 29-4 at 31 of 43.

[24] ECF No. 29-4 at 32 of 43.

[25] ECF No. 29-4 at 33 of 43.

Silva believed that Ms. Baker had been made whole with what she had received already and recommended that Ms. Baker's claim be denied absent additional information curing the problems that Ms. Silva believed she discovered.[26]

On March 11, 2021, Ms. Baker submitted a supplemental claim for UIM policy limits to Progressive.[27] Included in this supplemental claim were the opinions of two orthopedic surgeons: Drs. Casey Bachison and Michael Dee.[28] Both doctors provided future treatment recommendations based on a review of Ms. Baker's records and not based on their own treatment-based observations.[29] For example, Dr. Bachison—an orthopedic spine surgeon— stated that the following would be "more likely than not" regarding Ms. Baker's treatment: (1) "10-20 visits with physical therapy per year" at $2,500 per year;[30] (2) "progressive degenerative disc disease" that will lead to "facet joint arthritis and neck and low back pain," although no cost was attributed to this entry;[31] (3) "up to 3 epidural injections per year" to treat the herniated discs in her cervical and lumbar spine at $4,500 per year;[32] (4) "anterior cervical discectomy and fusion at levels C5-C6, C6-C7, and C7-T1" at a cost of $75,000;[33] and (5) "posterior lumbar discectomy and fusion," at a cost of $50,000.[34] From these things, Dr.

---

[26] ECF No. 29-4 at 33-34 of 43.

[27] ECF No. 29-5.

[28] ECF No. 29-5 at 4-13 of 13.

[29] ECF No. 29-5 at 4, 9 of 13 (stating that each doctor reviewed Ms. Baker's records).

[30] ECF No. 29-5 at 5 of 13 (recommending visits); 7 of 13 (stating cost).

[31] ECF No. 29-5 at 5 of 13.

[32] ECF No. 29-5 at 5 of 13 (recommending treatment); 7 of 13 (stating cost).

[33] ECF No. 29-5 at 5 of 13 (recommending surgery); 6 of 13 (stating cost).

[34] ECF No. 29-5 at 6 of 13 (recommending surgery); 7 of 13 (stating cost).

Bachison also recommended other procedures, therapies, and treatments, but the likelihood of those being necessary was less clear than those he said were "more likely than not." However, the procedures and treatment that Dr. Bachison said were "more likely than not" totaled more than $100,000 without adding any other ambiguously recommended treatment or general damages for pain and suffering, among other things.

Instead of opining on spinal care, Dr. Dee's analysis focused on Ms. Baker's shoulders and left ankle.[35] Although Dr. Dee recommended several different treatments and therapies, he mentioned the following as being required "more likely than not": (1) ongoing treatment for her left ankle for an unspecified cost;[36] (2) braces and activity modification for her left ankle at an unspecified cost;[37] (3) "a nerve conduction study and electromyography of her left lower extremity" at an unspecified cost;[38] (4) 5-10 physical therapy sessions per year at a cost of $12,500;[39] (5) 15 corticosteroid injections in her lifetime at a cost of $7,500;[40] (6) a right shoulder arthroscopy to repair her torn rotator cuff at a cost of between $15,000-35,000;[41] and, eventually, (7) a right total shoulder arthroplasty at a cost of between $40,000-50,000.[42] Thus, to address Ms. Baker's shoulder and ankle injuries, Dr. Dee's "more likely than not" costs were at

---

[35] ECF No. 29-5 at 9 of 13.

[36] ECF No. 29-5 at 10 of 13.

[37] ECF No. 29-5 at 10 of 13.

[38] ECF No. 29-5 at 10 of 13.

[39] ECF No. 29-5 at 10 of 13 (recommending therapy) and 12 of 13 (stating cost).

[40] ECF No. 29-5 at 11 of 13 (recommending treatment); 12 of 13 (stating cost).

[41] ECF No. 29-5 at 11 of 13.

[42] ECF No. 29-5 at 11 of 13.

least between $75,000 and $100,000. When combined, Drs. Bachison and Dee stated that between $175,000 and $200,000 in future treatment costs were "more likely than not."

Nevertheless, Ms. Silva was not persuaded. For starters, Ms. Silva characterized the letters from Drs. Bachison and Dee as "a summary of all the available treatment possibilities one could have for the spine and the [shoulder]/foot/ankle," and, therefore, the recommended therapies are "speculative and questionable," "arguably unclear," and "not reasonable."[43] Next, Ms. Silva noted that neither doctor examined Ms. Baker and that Ms. Baker has not received additional medical treatment since November 2020.[44] Additionally, Ms. Silva—who is not medically trained—compared an MRI from Ms. Baker before her accident and after and concluded that the MRI "showed stable condition and [was] unchanged."[45] Therefore, Ms. Silva stated, "I see no change in [the] value of this case" and sought authority "to reject" Ms. Baker's renewed claim because what Ms. Baker had previously received was "more than sufficient."[46]

On March 16, 2021, Ms. Silva contacted Ms. Baker's attorney and stated that no new offer would be extended because the opinions of Drs. Bachison and Dee were speculative and that Ms. Baker's "C-films" before the accident showed no change from the films taken after the accident.[47] Ms. Silva provided Ms. Baker's attorney with the name of the law firm that would represent Progressive if Ms. Baker decided to pursue litigation.[48]

---

[43] ECF No. 29-4 at 37 of 43.

[44] ECF No. 29-4 at 37 of 43.

[45] ECF No. 29-4 at 39-40 of 43.

[46] ECF No. 29-4 at 37 of 43.

[47] ECF No. 29-4 at 39 of 43.

[48] ECF No. 29-4 at 39 of 43.

On March 17, 2021, Ms. Baker's counsel contacted Ms. Silva inquiring whether there was any "wiggle room" in Progressive's position.[49] Ms. Silva reiterated that "the merits of the 2 [reports from Drs. Bachison and Dee] are up for debate" because those doctors did not examine Ms. Baker, listed all "conceivable treatments a person can have performed," did not say that surgery was "scheduled or certain," and opined that questionable treatments were needed.[50] Ms. Silva also stated that the reports of Drs. Bachison and Dee were prepared at the behest of an attorney and that Ms. Baker's pre-accident and post-accident MRIs show that her spine was stable.[51] Ms. Silva did not seek a medical opinion from an expert but, instead, stated that Progressive would explore its own medical opinions through its "own medical experts" once the case went to litigation or arbitration.[52] From this, Ms. Silva told Ms. Baker's attorney that the $103,000 in prior compensation made Ms. Baker more than whole.[53]

About a month later, Ms. Baker filed this action against Progressive in Utah Third District Court.[54] Ms. Baker's complaint asserts four causes of action: (1) underinsured motorist benefits; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; and (4) bad faith.[55] A month thereafter, Progressive removed Ms. Baker's action to this court.[56]

---

[49] ECF No. 29-4 at 40 of 43.

[50] ECF No. 29-4 at 40 of 43.

[51] ECF No. 29-4 at 40 of 43.

[52] ECF No. 29-4 at 40 of 43.

[53] ECF No. 29-4 at 40 of 43.

[54] ECF No. 29-1.

[55] ECF No. 29-1 at 2-4 of 4.

[56] ECF No. 2.

Progressive has moved for partial summary judgment on claims three and four referenced above (which are the same claim under Utah law) (collectively, "Bad Faith Claims").[57] Progressive claims that it is entitled to judgment as a matter of law on three grounds. First, Ms. Baker's $100,000 UIM demand was "fairly debatable." Second, Ms. Baker has failed to establish the fact of damages for her Bad Faith Claims. Finally, Progressive contends that Ms. Baker should have supplied expert opinion regarding whether Progressive met the standard of care for evaluating Ms. Baker's claim. Because Ms. Baker did not rely on an expert, Progressive argues, she cannot meet her burden of proof, which entitles Progressive to judgment as a matter of law. Following a recitation of the appropriate legal standard, the court discusses all three of these issues in order below.

## LEGAL STANDARDS

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A genuine issue of fact exists only where 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[58] "Thus, the relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"[59]

In evaluating a motion for summary judgment, the court "view[s] the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's

---

[57] ECF No. 29.

[58] *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[59] *Id*. (quoting *Anderson*, 477 U.S. at 251-52).

favor."[60] "'The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.'"[61] If the movant does not bear the burden of proof at trial as to the claims for which it seeks summary judgment, then the movant "may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim."[62]

"If the movant meets this initial burden, the burden then shifts to the nonmovant to set forth specific facts from which a rational trier of fact could find for the nonmovant."[63] To satisfy its burden, "the nonmovant must identify facts 'by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein.'"[64] "These facts must establish, at a minimum, an inference of the presence of each element essential to the case."[65] Entry of summary judgment is required,

> after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving

---

[60] *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).

[61] *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (quoting *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007)).

[62] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[63] *Id.* (quotations and citations omitted).

[64] *Savant Homes, Inc.*, 809 F.3d at 1137 (quoting *Libertarian Party of N.M.*, 506 F.3d at 1309).

[65] *Id.* at 1137-38 (quotations and citations omitted).

party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.[66]

"In this diversity case governed by Utah law, [the court] must ascertain and apply Utah law such that [the court] reach[es] the same result that the Utah courts would reach."[67] "Under Utah law, insurance policies are construed using general contract principles."[68] "The interpretation of an unambiguous contract is a question of law to be determined by the court and may be decided on summary judgment."[69] "If the policy language is clear and unambiguous, the court must construe it according to its plain and ordinary meaning."[70]

## ANALYSIS

### I.   Progressive Cannot Establish That Ms. Baker's Claim Is Fairly Debatable as a Matter of Law.

Progressive cannot show that Ms. Baker's claim is fairly debatable because reasonable minds can differ as to whether Progressive's conduct meets the standard of care. Because a duty

---

[66] *Celotex Corp.*, 477 U.S. at 322-23 (quotations omitted).

[67] *Utah Power & Light Co. v. Fed. Ins. Co.*, 983 F.2d 1549, 1553 (10th Cir. 1993).

[68] *Id.* (citing *Bergera v. Ideal Nat'l Life Ins. Co.*, 524 P.2d 599, 600 (Utah 1974)); *see also Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993) ("An insurance policy is merely a contract between the insured and the insurer and is construed pursuant to the same rules applied to ordinary contracts." (footnote omitted)); *Vill. Inn Apartments v. State Farm Fire & Cas. Co.*, 790 P.2d 581, 582 (Utah Ct. App. 1990) ("Insurance policies are merely contracts and should thus be interpreted under the same rules governing ordinary contracts.").

[69] *Utah Power & Light Co.*, 983 F.2d at 1553 (citing *Morris v. Mountain States Tel. & Tel. Co.*, 658 P.2d 1199, 1201 (Utah 1983)).

[70] *Id.* (citing *Draughon v. CUNA Mut. Ins. Soc'y*, 771 P.2d 1105, 1108 (Utah Ct. App. 1989)); *see also Alf*, 850 P.2d at 1274 (providing that in an unambiguous insurance policy, "the policy language is construed according to its usual and ordinary meaning"); *Vill. Inn Apartments*, 790 P.2d at 583 (providing that if insurance "policy terms are clear and unambiguous," the court must "interpret those terms in accordance with their plain and ordinary meaning, as they would be understood by the average, reasonable purchaser of insurance" (quotations and citations omitted)).

of good faith and fair dealing "inhere[s] in *every* contractual relationship,"[71] that duty applies to insurance contracts. Where, as here, the insurance contract at issue established a first-party relationship, this duty of good faith requires the insurer to: (1) "diligently investigate the facts" to determine "whether a claim is valid"; (2) "fairly evaluate the claim"; and (3) "act promptly and reasonably in rejecting or settling the claim."[72]

Although these are the standards of good faith for first-party insurers, Utah courts have also stated that if a claim is "fairly debatable," then "the insurer is entitled to debate it and cannot be held to have breached the implied covenant [of good faith]."[73] "'A "debatable reason," for purposes of determining whether a first-party insurer may be subjected to bad-faith liability, means an arguable reason, a reason that is open to dispute or question.'"[74] "A claim is therefore fairly debatable as a matter of law only when there is a legitimate factual issue as to the validity of the insured's claim, such that reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care."[75] The issue of whether the insurance company fairly evaluated the insured's claim is decided simultaneously with the issue of whether the claim is fairly debatable.[76]

---

[71] *Beck v. Farmer Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985) (emphasis added).

[72] *Id.*

[73] *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 (Utah 1996).

[74] *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 34, 56 P.3d 524 (quoting 14 Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE 3d § 204:28 (1999)).

[75] *M.A. v. Regence BlueCross BlueShield of Utah*, 2020 UT App 177, ¶ 17, 479 P.3d 1152 (quotations and citations omitted).

[76] *Jones v. Farmers Ins. Exch.*, 2012 UT 52, ¶ 16, 286 P.3d 301 (holding, after determining that reasonable minds could differ about whether the plaintiff's claim was fairly debatable, "that [the

To avoid the temptation to play Monday morning quarterback with the benefit of hindsight and a more developed record, courts determine the issue of "fairly debatable" from the date on which the insurance company denied the insured's claim.[77] This means that the only relevant information the court should consider is what the insurance company had before it at the time of claim denial.[78] The claim at issue here was for policy limits of $100,000. Thus, this court must determine whether Progressive's decision not to pay $100,000 to Ms. Baker when it finally denied Ms. Baker's claim on March 17, 2021, was "fairly debatable" with the information that Progressive had before it.

To make this determination, the Utah Supreme Court's decision in *Jones v. Farmers Insurance Exchange*,[79] is helpful if not dispositive. In *Jones*, the plaintiff was in a car accident four years *before* he first reported that his teeth had been cracked in that accident.[80] The plaintiff sought underinsured motorist coverage from the defendant insurance company in the amount of $30,000.[81] In support of his first-party claim, the plaintiff obtained a letter from his dentist who

---

plaintiff] has presented a factual question for the jury regarding whether [the defendant] evaluated his claim fairly under the standard articulated in *Beck*").

[77] *Id*. at ¶ 7 ("Therefore, an insurer cannot be held to have breached the covenant of good faith on the ground that it wrongfully denied coverage if the insured's claim, although later found to proper, was fairly debatable *at the time it was denied*." (emphasis added) (quotations and footnote omitted)).

[78] *Lund v. Truck Ins. Exch*., 2021 UT App 64, ¶ 29, 494 P.3d 1045 ("Here, the central substantive question is whether, at the time [the defendant] denied the claim, it had facts in front of it that indicated that the validity of the [plaintiffs'] claim was fairly debatable."); *Regence BlueCross Blue Shield of Utah*, 2020 UT App 177 at ¶ 23 (evaluating whether first-party insurance claim was fairly debatable based on records that insured submitted to insurance company).

[79] 2012 UT 52, 286 P.3d 301.

[80] *Id*. at ¶ 2.

[81] *Id*.

stated that the plaintiff's teeth had been cracked in the earlier accident, and, regardless of the time frame, $14,000 would cover the necessary treatment.[82] The insurance company's notes indicated no other support in the record—other than the plaintiff's statement—that his damaged teeth resulted from the accident.[83] In other words, the plaintiff never mentioned his teeth to any doctors or to the at-fault driver's insurance company.[84] Consequently, the insurance company denied the plaintiff's claim for $30,000 and, instead, offered the plaintiff $5,000.[85]

The plaintiff sued his insurance company for bad faith, among other things, and the insurance company countered that the plaintiff's claim was fairly debatable.[86] On cross-motions for summary judgment, the insurance company argued that the plaintiff's claim was fairly debatable because he had not reported injured teeth to anyone but, instead, claimed the injury four years after the accident, which called his credibility into question.[87] The insurance company also argued that it could discount the opinion of the plaintiff's dentist because "an insurer may refute the shaky opinion of a doctor with logic and common sense."[88] After all, if the plaintiff's teeth had been injured in the accident, the insurance company would have expected the plaintiff to complain of pain and discomfort at some point during the prior four years with chewing and

---

[82] *Id.* at ¶¶ 2-3.

[83] *Id.* at ¶ 3.

[84] *Id.* at ¶ 15.

[85] *Id.* at ¶ 4.

[86] *Id.* at ¶ 5.

[87] *Id.* at ¶ 15.

[88] *Id.* at ¶ 16 (quotations omitted).

sensitivity to cold, among other things.[89] But because the plaintiff never complained about any of that for four years, the insurance company argued, the plaintiff's claim was sufficiently speculative to render it fairly debatable notwithstanding the opinion of the plaintiff's dentist.[90] The insurance company further contended that it did not need to obtain its own medical opinion "because a second medical opinion is not required 'to point out the obvious.'"[91] Consequently, the insurance company argued that the plaintiff's claim was fairly debatable.

The Utah Supreme Court disagreed with the insurance company and found that the case should go to trial because reasonable minds could differ as to whether the defendant's handling of the claim conformed to the requisite standard of care.[92] The court acknowledged that "[i]nsurers are entitled to use common sense, but in this case the insurer's common sense conflicted with the *only medical opinion* it possessed relating to [the plaintiff]'s teeth."[93] Because the plaintiff was the only party in the dispute with a medical opinion, "a jury could find that [the insurance company] should not have considered it obvious that a person with multiple injuries would seek treatment for cracked teeth without delay."[94]

Ms. Baker's case closely follows *Jones*. Similar to the insurance company in *Jones*, Progressive was clearly skeptical regarding the reasonableness and necessity of future surgeries and treatments that Ms. Baker's Physician Assistant and two reviewing orthopedic surgeons

---

[89] *Id.*

[90] *Id.* at ¶¶ 15-16.

[91] *Id.* at ¶ 16.

[92] *Id.*

[93] *Id.* (emphasis added).

[94] *Id.*

stated were more-likely-than-not necessary. And, like *Jones*, the battle of opinions over the medical necessity of further treatment is between the commonsense view of a medically untrained claims adjuster (i.e., Ms. Silva), on the one hand, and two orthopedic surgeons (i.e., Drs. Bachison and Dee) on the other. In other words, like *Jones*, the plaintiff has produced the "only medical opinion"[95] in this dispute, and that medical opinion indicates that Ms. Baker is more likely than not to require more than $100,000 in future medical treatments. That the doctors found certain treatments to be necessary "more likely than not" is important because that is precisely the standard that the doctors would have to provide to have their future treatment opinions admissible at trial.[96] Although Progressive may have its commonsense-based reasons to question the recommendations of Drs. Bachison and Dee (e.g., they are biased because the doctors have a lien on Ms. Baker's monetary recovery), the Utah Supreme Court has held that insurance-company common sense versus medical opinion yields a trial—not judgment as a matter of law on the issue of whether the claim is fairly debatable.

The Utah Supreme Court's determination to send insurance-company common sense versus medical opinion to trial makes sense in this case too. To illustrate why, consider Ms. Silva's four reasons for disregarding the opinions of Drs. Bachison and Dee: (1) the doctors' opinions were speculative, uncertain, and merely listed all possible treatments that Ms. Baker could receive; (2) the doctors did not examine Ms. Baker, and their reports were prepared at the

---

[95] *Id.*

[96] *Dalebout v. Union Pac. R.R. Co.*, 980 P.2d 1194, 1199 (Utah Ct. App. 1999) (stating that to admit medical testimony about future treatments, the plaintiff must "introduce evidence to demonstrate that the future event will *more likely than not* occur" (quotations and citations omitted) (emphasis added)).

behest of a lawyer; (3) Ms. Baker did not receive any medical treatment for four months preceding the denial of her UIM claim; and (4) Ms. Silva herself compared Ms. Baker's pre- and post-accident MRIs and found that her spine was stable. As shown below, each of these reasons merely create a triable fact issue instead of demonstrating that "reasonable minds could not differ as to whether the insurer's conduct measured up to the required standard of care."[97]

First, Ms. Silva's reading of Drs. Bachison's and Dee's opinions ignores the fact that each clearly stated that certain future treatments would be necessary "more likely than not," which is the admissibility standard at trial for future medical treatment.[98] Reading the doctors' letters *only* for those "more likely than not" treatments clearly shows that potential future medical expenses for Ms. Baker might exceed $100,000. However, Ms. Silva appears to discount the doctors' opinions because their recommendations were not certain or the procedures were not already scheduled. Whether Ms. Silva's own evidentiary standard for countenancing future medical treatments is too onerous to be reasonable is a key question as to whether Progressive met the standard of care. Therefore, the jury should have a chance to determine whether Progressive's application of a higher evidentiary burden is warranted or whether it is evidence of an unfair evaluation of the claim.

---

[97] *Regence BlueCross BlueShield of Utah*, 2020 UT App 177 at ¶ 17 (quotations and citations omitted).

[98] *Dalebout*, 980 P.2d at 1199 (stating that to admit medical testimony about future treatments, the plaintiff must "introduce evidence to demonstrate that the future event will *more likely than not* occur" (quotations and citations omitted) (emphasis added)).

Second, doctors do not have to examine a patient before rendering an opinion about future care.[99] And the fact that the doctors' opinions were sought by lawyers does not necessarily mean that those opinions are so suspect as to be entirely discounted. Ms. Silva presumably determined that rendering a medical opinion from an attorney referral is suspect because a doctor may be motivated by profit. But even assuming that the doctors' opinions in this case were motivated by profit, they can still be medically accurate. The doctor's financial interest in a patient's future settlement does not necessarily mean that the doctor's diagnoses and prognoses are so flawed that they can be disregarded entirely. By illustration, even if the doctors' opinions were inflated by 50% due to bias, the medical procedures they found to be necessary "more likely than not" could still equal UIM policy limits. Instead of a judge on summary judgment, the jury is best positioned do determine whether Progressive's bias determination reasonably discounted the doctors' opinions under the applicable standard of care.[100]

Third, although Ms. Baker did not receive additional medical treatment between November 2020 and March 2021, when Progressive denied her claim, that, by itself, does not make her claim fairly debatable. Drs. Bachison and Dee reviewed Ms. Baker's medical records, which showed her hiatus from treatment from November 2020 to the date they each rendered their respective opinions. But this hiatus did not change their opinions on future medical care.

---

[99] *See, e.g.*, *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1125 (9th Cir. 1994) (finding that expert was able to testify because opinion was based on medical records, clinical experience, preliminary results from an epidemiological study, and medical literature).

[100] *Ross v. Cecil Cnty. Dep't of Soc. Servs.*, 878 F.Supp. 2d 606, 621 n.26 (D. Md. 2012) ("[I]t is impossible to weigh the credibility of witnesses based on their affidavits, and the Court at summary judgment [does] not have . . . the benefit of cross examination to evaluate biases and to establish the ability of witnesses to observe what occurred." (alterations in original) (quotations and citation omitted)).

Although that hiatus was relevant to Ms. Silva's determination of future care, it does not appear relevant to Drs. Bachison and Dee's analysis of the same. Consequently, reasonable minds can differ as to whether Ms. Baker's hiatus from treatment reasonably permitted Progressive to entirely discount the doctors' opinions under the relevant standard of care, which is why the jury gets to decide instead of a judge at summary judgment.

Finally, a reasonable jury could find that, despite Ms. Silva's qualifications as an experienced insurance adjuster, she is not medically trained to read Ms. Baker's MRIs and to medically challenge the opinions of two experienced orthopedic surgeons. Although Progressive may argue that the commonsense approach of Ms. Silva should carry the day, *Jones* clearly shows that in a contest of insurance-adjuster common sense versus medical opinion, the medical opinion is sufficient to at least raise a factual issue for a jury to decide whether the claim was fairly debatable. At trial, a jury may find Ms. Baker's claim fairly debatable for all the reasons that Ms. Silva asserted. But the jury may also determine that Progressive's reliance on a non-medically trained insurance adjuster who read Ms. Baker's MRIs and discounted the contrary opinions of two orthopedic surgeons without seeking a medical opinion on Progressive's behalf failed to meet the standard of care to fairly evaluate Ms. Baker's claim. Accordingly, Progressive's fairly debatable argument is insufficient to carry the day at summary judgment.

Despite the foregoing, Progressive contends that "[t]o require an insurer to hire experts before denying a claim anytime the medical evidence creates a legitimate factual question as to the claim's validity would—besides being absurdly impractical and expensive for insurers—

eviscerate the fairly debatable defense."[101] This argument is unpersuasive. Neither *Jones* nor this court has ruled that an insurance company is required to hire a medical expert when evaluating a claim. However, what *Jones* instructs is that if an insurance company wants to avoid a trial on a bad faith claim when a plaintiff submits qualified medical opinion before claim denial, then the insurance company should use qualified medical opinion too.

Ironically, holding otherwise would not "eviscerate the fairly debatable defense"; it would actually eviscerate the bad faith cause of action altogether. As this case amply shows, to grant summary judgment for Progressive here, the court must: (1) rule that an insurance company can discount any qualified medical opinion for future care that is not certain or scheduled even though the admissibility standard at trial is "more likely than not"; (2) assume that doctors cannot render an expert opinion based on medical records, which is a common occurrence; (3) presume that doctors who have lawyer-referred patients are so biased that their medical opinions are *automatically* meritless or at least fairly debatable; and (4) allow the opinion of an insurance adjuster with no medical training to trump the contrary opinions of two trained orthopedic surgeons as to what information is relevant in determining Ms. Baker's future care despite the fact that Ms. Silva would *never* be allowed to offer medically based opinion testimony at trial under Fed. R. Evid. 702. In other words, if Ms. Silva's medically untrained opinions are so powerful that they not only trump the opinions of two orthopedic surgeons but also show that "reasonable minds could not differ as to whether the insurer's conduct measured

---

[101] ECF No. 34 at 11 of 20.

up to the required standard of care,"[102] then any claims adjuster's disagreement with medical evidence will carry the day without a trial. This would effectively end the bad faith cause of action because the "fairly debatable" defense would morph into an absolute defense from suit instead of a defense against liability.

To make the bad faith cause of action available for insureds while protecting the fairly debatable defense for the insurer, the Utah Supreme Court has established a fair balance. When the pre-claim denial is based on insurance company common sense, and the plaintiff's claim is backed up by medical expert opinion, then a *jury* should evaluate the merits of the "fairly debatable" defense.[103] But when the insurance company's pre-claim denial is based on medical opinion that contradicts the medical opinion of the plaintiff's experts, then a *judge* can find a summary judgment that a claim is "fairly debatable" as a matter of law.[104] Although there are sure to be cases with facts that will require deviation from these approaches, this case is not one of them. Indeed, for the reasons shown above, Ms. Baker's claim falls squarely within the holding of *Jones*, which means that a jury should determine whether her claim was "fairly debatable." Accordingly, Progressive's motion for summary judgment on this point is denied.

## II.    Progressive Is Entitled to Summary Judgment Because Ms. Baker Has Failed to Establish the Fact of Damages for Her Bad Faith Claims.

Although Ms. Baker's claim is not fairly debatable as a matter of law, Ms. Baker has failed to show the fact of damages for her Bad Faith Claims, which entitles Progressive to

---

[102] *Regence BlueCross BlueShield of Utah*, 2020 UT App 177 at ¶ 17 (quotations and citations omitted).

[103] *Jones*, 2012 UT 52 at ¶ 16.

[104] *Prince*, 2002 UT 68 at ¶ 34.

summary judgment. "A breach of contract claim requires four essential elements of proof, one of which is damages."[105] The element of damages consists of two parts: (1) fact of damages, and (2) the amount of damages.[106] "To establish the fact of damages, [t]he evidence . . . must give rise to a reasonable probability that the plaintiff suffered damage."[107] And although "the standard for determining the amount of damages is not so exacting as the standard for proving the fact of damages, there still must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages.'"[108] Ms. Baker has failed to meet this exacting standard here.

In response to Progressive's motion for summary judgment contending that Ms. Baker cannot establish the fact of damages, Ms. Baker asserts only "consequential damages."[109] Specifically, Ms. Baker contends that she can establish four categories of consequential damages: (A) litigation costs and (B) attorney's fees "from being forced into litigation due to Progressive's failure to fairly assess Mrs. Baker's claim"; (C) "[e]motional damages from protracted litigation with her own insurance company"; and (D) "[e]motional damages from being disallowed financially to undergo necessary medical care."[110] However, the court shows below that Ms. Baker cannot meet her burden to withstand summary judgment as to each category of consequential damages.

---

[105] *Eleopulos v. McFarland & Hullinger, LLC*, 2006 UT App 352, ¶ 10, 145 P.3d 1157.

[106] *Stevens-Henager Coll. v. Eagle Gate Coll.*, 2011 UT App 37, ¶ 16, 248 P.3d 1025.

[107] *Id.* (quotations and citations omitted) (alterations in original).

[108] *Id.* (quotations and citations omitted).

[109] ECF No. 31 at 11-12 of 14.

[110] ECF No. 31 at 12 of 14.

A.  <u>Costs of Litigation Are Not Consequential Damages</u>.

Where a plaintiff does not assert "any damages as a consequence of a [d]efendant's bad faith refusal to pay [her] claims other than the costs associated with having to commence a legal action to enforce [her] claims[,] [s]uch damages are not consequential damages that were contemplated by the policy."[111] This is especially true where, as here, Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920 control the award of costs to the prevailing party in litigation. Whereas Fed. R. Civ. P. 54(d)(1) allows a court to award "costs[,] other than attorney's fees," section 1920 "defines the term 'costs' as used in Rule 54(d)."[112] Section 1920 limits the costs a court may award to six categories.[113] However, the award of costs is not predicated on proving that they were caused by another party's illicit behavior. Instead, costs are awarded *independently* from any particular cause of action. Indeed, even a prevailing defendant can obtain an award of costs despite not bringing any cause of action against a plaintiff. Given the independence of costs of litigation and the causes of action in litigation, costs cannot be consequential damages for any particular cause of action. Therefore, Ms. Baker's assertion of litigation costs cannot establish the fact of damages for her Bad Faith Claims.

---

[111] *Grinshpun v. Travelers Cas. Co. of Conn.*, No. 6702/2008, 2009 WL 1025747, at *4 (N.Y. Sup. Ct. March 11, 2009).

[112] *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 565 (2012) (quotations and citation omitted).

[113] 28 U.S.C. § 1920(1)-(6).

B. Even Though Attorney's Fees Are Consequential Damages, and Assuming Utah Law Allows Them to Establish the Fact of Damages in First-Party Bad Faith Insurance Claims, Ms. Baker Has Not Suffered Such Damages in This Action.

Although the Utah Supreme Court unanimously recognized that attorney's fees in first-party insurance actions are recoverable "consequential damages,"[114] the Utah Supreme Court has also stated in a potentially analogous context that attorney's fees as consequential damages are unrecoverable when the party has failed to first prove any non-attorney fee consequential damages.[115] Other jurisdictions too seem to be divided on this issue with, among others, the California Supreme Court recognizing that attorney's fees can meet the element of damages in first-party bad faith actions and the Colorado Supreme Court holding the opposite.[116] Given the foregoing, whether attorney's fees can fulfill the element of the fact of damages for bad faith insurance claims in the first-party context is an open question under Utah law, which caused District Judge Jill N. Parrish to wisely certify the issue to the Utah Supreme Court in

---

[114] *Billings*, 918 P.2d at 468 ("Attorney fees may be recoverable as consequential damages flowing from an insurer's breach of either the express or implied terms of an insurance contract"). The dissenting Justices also agreed that attorney's fees are recoverable as consequential damages "for defendant's breach of the implied covenant of good faith and fair dealing." *Id.* at 469.

[115] *Neff v Neff*, 2011 UT 6, ¶ 89, 247 P.3d 380 ("[E]ven if attorney's fees ought to be available as consequential damages in all claims for breach of fiduciary duty, we decline the invitation to adopt such a rule where the party has failed to prove any damages resulting from the breach.").

[116] *Compare Brandt v. Superior Ct.*, 693 P.2d 796, 798-99 (Cal. 1985) (holding that attorney's fees can satisfy the element of damages in a first-party bad faith insurance claim because hiring a lawyer to deal with an insurance company's bad faith is akin to hiring a doctor to resolve injuries from a car accident), *with Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1290-91 (Col. 1996) (rejecting *Brandt* and holding that attorney's fees in first-party bad faith insurance claims cannot satisfy the element of damages and are available only after proving the elements of the claim with damages other than attorney's fees), *superseded by statute,* Colo. Rev. Stat. Ann. § 10-3-1116, *as recognized in Casper v. Guarantee Tr. Life Ins. Co.*, 2016 COA 167, ¶ 44, 421 P.3d 1184, *aff'd in part, rev'd in part sub nom. Guarantee Tr. Life Ins. Co. v. Est. of Casper by & through Casper*, 2018 CO 43, 418 P.3d 1163.

*Angus v. State Farm Fire & Casualty Co.*[117] However, that case settled before the Utah Supreme Court opined on the issue,[118] which mooted the certified question. Consequently, the court asked the parties in the instant action if they wanted this court to re-certify the question, but the parties declined this court's invitation.[119] Thus, this court is tasked with predicting "what the state supreme court would do."[120]

Thankfully, sorting out this complicated question under Utah law is unnecessary here because even if this court assumes that the Utah Supreme Court would allow attorney's fees to establish the fact of damages in first-party insurance claims, Mr. Baker cannot meet her burden. To establish the fact of damages, the plaintiff must offer a "reasonable probability," that he/she has incurred damages because of the defendant's breach of contract.[121] By definition, a "reasonable probability" is more than a hypothetical, inchoate possibility of damages.

Ms. Baker has not provided any evidence in her filings showing that she has paid an attorney to vindicate her rights under her UIM policy with Progressive. Moreover, Ms. Baker cannot present such evidence because her attorney is working on a contingency fee basis.[122] In other words, Ms. Baker's attorney's fees at this juncture are merely hypothetical and inchoate, which means she owes fees only *if* she proves the elements of her case *and* receives an award of

---

[117] No. 1:21-cv-00034-JNP-JCB, ECF No. 54.

[118] *Id*. at ECF No. 62 (order dismissing the action with prejudice).

[119] ECF Nos. 42-43.

[120] *Angus v. State Farm Fire & Cas. Co.*, No. 121-cv-00034-JNP-JCB, 2022 WL 4610047, at *9 (D. Utah Sept. 30, 2022) (quotations and citation omitted).

[121] *Stevens-Henager Coll.*, 2011 UT App 37 at ¶ 16 (quotations and citations omitted).

[122] ECF No. 43 at 2.

damages. Such a hypothetical possibility of having to pay attorney's fees is insufficiently certain to carry the burden of establishing the fact of damages. Thus, even if this court assumes that a plaintiff can rely on attorney's fees to establish the fact of damages in first-party bad faith insurance claims under Utah law, Ms. Baker has failed to establish that she actually suffered those damages.[123]

      C.  <u>Emotional Damages from This Litigation Are Not Consequential Damages</u>.

      Ms. Baker cannot establish the fact of damages for mental suffering because "there can be no award for mental anguish that accompanies the stressful nature of a lawsuit."[124] Ms. Baker claims that her mental anguish stems from being "forced" into "protracted litigation."[125] This does not state a legitimate consequential damage claim for mental anguish.

      By illustration, consider *Timms v. Rosenblum*.[126] In *Timms*, the plaintiff sued her former attorneys for malpractice and alleged that the litigation against them caused her mental anguish for which she sought compensation.[127] In rejecting her claim, the *Timms* court stated:

> The wisdom of precluding mental anguish damages in this case is
> confirmed by considering the consequences of a contrary ruling. . . .

---

[123] Although contingent attorney's fees cannot be used to establish the fact of damages, if a plaintiff were to prevail on his/her first-party bad faith cause of action, a court could award all of the contingent attorney's fees upon prevailing in the case. *Billings*, 918 P.2d at 468 (remanding attorney's fee award to district court to determine contingency fee award after affirming jury verdict in plaintiff's favor). Thus, attorney's fees that are based on a contingency fee may not be certain enough to satisfy the fact of damages element, but they are compensable after the claim is proven in order to make the plaintiff whole. Indeed, it is the damage to the *plaintiff* that matters for satisfying the element of fact of damages, not the missed business opportunity that the plaintiff's lawyer has suffered.

[124] *Swanston v. City of Plano*, No. 19-cv-412, 2022 WL 2704532, at *4 (E.D. Tex. July 12, 2022).

[125] ECF No. 31 at 12 of 14.

[126] 713 F. Supp. 948 (E.D. Va. 1989).

[127] *Id.* at 949, 954.

> The simple truth is that mental anguish attends all litigation. Any lawyer who has practiced for any substantial time in virtually any area of law will immediately confirm that parties in all of these areas make substantial emotional investments in their causes and suffer mental anguish in the event of an adverse result. This is manifestly so in areas of civil litigation involving claims of employment discrimination, wrongful discharge, civil rights violations, handicapped rights violations, labor disputes, worker's compensation and indeed even patent, copyright and corporate disputes.[128]

Moreover, it seems odd for Ms. Baker to initiate this action as the plaintiff and then contend that she was "forced" to engage in discovery in the lawsuit she filed, thereby multiplying damages against Progressive, which has an absolute right to defend itself in court.[129] Indeed, upon filing a lawsuit, Ms. Baker assumed the risk of feeling stress, anxiety, and mental preoccupation with litigation, its strategy, and its uncertain outcome.[130] Therefore, the stress of a lawsuit that Ms. Baker initiated cannot establish the fact of damages for her Bad Faith Claims.

---

[128] *Id.* at 955.

[129] *See, e.g.*, *Stoleson v. United States*, 708 F.2d 1217, 1223 (7th Cir. 1983) ("It would be strange if stress induced by litigation could be attributed in law to the tortfeasor. An alleged tortfeasor should have the right to defend himself in court without thereby multiplying his damages . . . .").

[130] *Clark v. United States*, 660 F. Supp. 1164, 1200 (W.D. Wash. 1987) ("You can argue that the stress of litigation is caused by the harm that gave rise to the litigation. On the other hand, the litigation is something that people do as a matter of choice, and it in and of itself and separately from the underlying harm can be a substantial stressor in the lives of individuals."); *Picogna v. Bd. of Educ. Twp. of Cherry Hill*, 671 A.2d 1035, 1038–39 (N.J. 1996) ("Both the state and federal cases reflect the view that because anxiety is an unavoidable consequence of the litigation process, it does not form a separate basis for recovery against one's opponent. Although the damages caused by the wrongful conduct induce the litigation, and hence the attendant stress, a plaintiff chooses to pursue litigation cognizant of both the economic and emotional costs that it will entail. Some of the stress is caused by a general distaste for litigation, and some by a plaintiff's vigorous participation in the litigation process. Yet the substantial emotional investment made by a plaintiff in a case is merely the normal result of being a litigant. We hold, therefore, that plaintiff may not recover for litigation-induced distress as a separate component of damages. Plaintiff may, however, recover for severe emotional distress proximately caused by the pre-and post-termination events exclusive of the litigation.").

   D.  <u>Ms. Baker Has Failed to Provide Any Facts Showing That Progressive's Delay in
Payment Is the Cause of Her Not Obtaining Surgery</u>.

Although Utah law allows an insured plaintiff to recover consequential damages arising

from the emotional distress of being financially unable to obtain medical treatment due to the

insurer's bad faith denial of a claim,[131] Ms. Baker has not provided any evidence showing

Progressive's failure to pay is the reason she has not sought additional medical treatments. In

other words, Ms. Baker cannot show that Progressive's failure to timely pay her claim is the

cause of her emotional pain and suffering.[132]

For example, in her deposition, Ms. Baker was asked, "So is there a reason why you

haven't received any treatment between then [i.e., November 2020] and now [i.e., July 27, 2021]

for injuries related to this accident?"[133] If Progressive's failure to pay was one of the reasons,

then this would have been the time for Ms. Baker to say so. She didn't. Instead, she said:

> Just figured it -- we knew what was going on and we just deal with
> it. I am going back to have the leg x-rayed again because it's still
> painful. We know that the bone healed because the doctor with Dr.
> Heiden there said it had healed, but there's still the tender spots so
> we're concerned why it's still tender after all this time.[134]

Deposing counsel gave Ms. Baker another opportunity to state that Progressive was the

reason she was not obtaining additional treatments when he asked, "So is there a reason why you

---

[131] *Billings*, 918 P.2d at 467-68 (affirming jury award because plaintiff provided sufficient proof
that he suffered mental anguish by not being able to continue necessary treatment due to
insurance company's bad faith denial of claim).

[132] *Machan v. UNUM Life Ins. Co. of Am.*, 2005 UT 37, ¶ 9, 116 P.3d 342 (holding that
consequential damages for insurance company's breach of covenant of good faith and fair
dealing are limited to "any damages [that] were caused by the breach").

[133] Sandra Baker July 27, 2021 Deposition Transcript ("Dep. Tr.") 55:16-18.

[134] Dep. Tr. 55:19-25.

haven't returned for physical therapy?"[135] But instead of blaming Progressive's failure to pay, Ms. Baker stoically said, "Just figured it wasn't gonna change it much, you know, for the neck. [Bec]ause they diagnosed that we can make it feel good for a couple hours, but surgery is the only thing that's gonna basically relieve the pain."[136]

As to neck surgery, deposing counsel asked, "What's your understanding of how the surgery on your neck would be paid?"[137] Here is another instance where one would expect Ms. Baker to unequivocally state something to the effect of "Progressive's UIM proceeds." But, instead, she said, "Well, I haven't thought about it."[138] Additionally, near the conclusion of her deposition, Mr. Baker's counsel asked her a few follow-up questions, but none of Ms. Baker's answers pointed the finger at Progressive's failure to pay as the reason she had not sought additional medical treatment including neck surgery.[139]

When the court asked Ms. Baker's counsel at oral argument whether there was any evidence showing that Progressive's failure to pay caused Ms. Baker any pain and suffering, Ms. Baker's counsel argued that Dr. Dee mentioned that Ms. Baker has been unable to participate in pre-accident activities due to the accident,[140] and Dr. Bachison opined that Ms. Baker has suffered "exacerbation" of pain due to the accident.[141] However, both Drs. Bachison and Dee

---

[135] Dep. Tr. 56:10-11.

[136] Dep. Tr. 56:12-16.

[137] Dep. Tr. 81:14-15.

[138] Dep. Tr. 81:18.

[139] Dep. Tr. 82:18 to 85:16.

[140] ECF No. 29-5 at 10 of 13.

[141] ECF No. 29-5 at 4 of 13.

merely highlight Ms. Baker's proof problem because neither states that Progressive's failure to timely pay the claim is the cause of any of Ms. Baker's pain; it is the accident.

Additionally, in her opposition to summary judgment, Ms. Baker has not submitted any declaration or other evidence showing that she has not sought medical treatment because Progressive failed to pay her UIM claim. Although the evidence in the record shows that Ms. Baker still suffers neck pain because of the accident and is "contemplating" neck surgery to relieve that pain,[142] nothing in the record before the court shows that Progressive is the reason (or even a substantial factor) that Ms. Baker has not sought that treatment much less suffered anxiety for it. Accordingly, although Utah law allows Ms. Baker to receive consequential damages for physical and emotional pain for not obtaining medical treatments due to Progressive's failure to pay, she has not produced any evidence showing that Progressive's failure to pay is the cause of not receiving those treatments.

In response to this dearth of evidence, Ms. Baker argues that she did not have to make the requisite evidentiary showing of damages because Progressive "did not cite any material to support its allegation" that she had failed to assert consequential damages.[143] Specifically, Ms. Baker contends that Fed. R. Civ. P. 56(c)(1) first requires Progressive to point to particular parts of the record showing that Ms. Baker has not established consequential damages before she has the obligation to provide specific proof refuting Progressive's assertion.[144] In other words, Ms. Baker contends that, instead of arguing that nothing in the record shows that Ms. Baker has

---

[142] Dep. Tr. 57:17-20.

[143] ECF No. 31 at 12 of 13.

[144] ECF No. 31 at 12 of 13.

established the fact of consequential damages, Progressive must provide the deposition, interrogatories, requests for production, and any other discovery tool used in the case and then say that nothing therein shows that Ms. Baker can prove consequential damages *before* Ms. Baker bears the burden of producing information to the contrary. Accordingly, Ms. Baker's opposition to Progressive's motion for summary judgment "reserve[d] the right to address [Progressive]'s allegation [of no damages] if/once [Progressive] fulfills its burden through a properly submitted and supported motion."[145]

Ms. Baker's attempt to shift the burden of production to Progressive is based on a misreading of Rule 56's text and lacks any support in case law. Rule 56(c)(1) provides that "[a] party asserting that a *fact cannot be or is genuinely disputed* must support the assertion by," among other things, "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[146] Ms. Baker reads the above-emphasized language to mean: "A party asserting that a fact cannot exist" must support the assertion by citing to the items listed in Rule 56(c)(1)(A). However, the grammatical construction of "[a] party asserting that a fact cannot be or is genuinely disputed," means that "[a] party asserting that a fact cannot be [genuinely disputed] or is genuinely disputed" must cite to the materials listed in Rule 56(c)(1)(A). Stated differently, if a party is asserting that "a fact cannot be [genuinely disputed]"—i.e., the fact is clearly manifested in the record—then that

---

[145] ECF No. 31 at 12.

[146] Fed. R. Civ. P. 56(c)(1) (emphasis added).

party must show where in the record that undisputed fact is found. But nothing in Rule 56(c)(1)(A) requires a party to point out everywhere in the record a fact is not.

Case law amply demonstrates this rule. According to the Court of Appeals for the Tenth Circuit, because Progressive does not bear the burden of proof at trial as to the claims for which it seeks summary judgment, all it must do is "point[] out to the court a lack of evidence on an essential element of the nonmovant's claim."[147] Other courts around the nation are in accord with the Tenth Circuit and have stated that showing that no evidence exists can be done by simply arguing it in a "memorandum or brief."[148] Nothing in Rule 56 or case law requires Progressive to prove a negative.[149] Because Progressive clearly argued in its motion for summary judgment that Ms. Baker had not established the element of damages, the burden of production shifted to Ms. Baker to show facts in the record establishing at least a factual dispute as to the challenged element.[150] But Ms. Baker came forward with neither facts nor evidence showing that she has suffered consequential damages as a result of Progressive's failure to timely pay her claim. And what is in the record shows that she did not point to Progressive as the cause of any consequential damages when she clearly had the chance to do so. Accordingly, Ms. Baker has

---

[147] *Libertarian Party of N.M.*, 506 F.3d at 1309 (citing *Celotex Corp.*, 477 U.S. at 325); *see also Savant Homes, Inc.*, 809 F.3d at 1137.

[148] *Clark v. N.Y. City Housing Auth.*, No. 20-cv-251 (PAE) (GWG), 2022 WL 4229386, at *5 (S.D.N.Y. Sept. 14, 2022) (quotations and citations omitted).

[149] *Id.*; *see also Estate of Gonazles v. Hickman*, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *5 n.42 (C.D. Cal. May 30, 2007) ("[U]nder Rule 56, a defendant is not required to prove a negative—i.e., the *absence* of genuine issues of material fact—to establish his or her entitlement to summary judgment. Rather, the party may simply assert that there is no evidence to substantiate the material allegations of the complaint. To defeat the motion, plaintiffs must adduce evidence contradicting defendant's claim." (emphasis in original)).

[150] *Estate of Gonzales*, 2007 WL 3237727, at *5 n.42.

failed to establish the fact of damages as to her Bad Faith Claims, and Progressive is entitled to summary judgment even though Ms. Baker's claim is not fairly debatable as a matter of law.

III.   **Ms. Baker's Bad Faith Claims Do Not Require Expert Testimony to Survive Summary Judgment.**

Ms. Baker's failure to provide an expert on insurance claim processing is not fatal to her bad faith claim. State law determines whether expert testimony is required in a particular case.[151] In Utah, "expert testimony is not necessary in all cases[;] it is required where the average person has little understanding of the duties owed by particular trades or professions."[152] "Expert testimony is unnecessary only in cases where the defendant's conduct is within the common knowledge and experience of the layman."[153] Utah courts' expressions of "the test" to determine if expert testimony is required vary but focus a common theme: whether the average bystander could provide the same testimony without relying on speculation.[154] This test must be applied to every element of the claim.[155]

---

[151] *See, e.g.*, *Gans v. Mundy*, 762 F.2d 338, 341-42 (3rd Cir. 1985) (applying state law to determine whether expert testimony required).

[152] *Kirkham v. McConkie*, 2018 UT App 100, ¶ 8, 427 P.3d 444 (quotations and citation omitted).

[153] *Id.* (quotations and citation omitted).

[154] *Id.* (stating that "[t]he test for determining whether testimony must be provided by an expert is whether the testimony requires that the witness have scientific, technical, or other special knowledge; in other words, whether an average bystander would be able to provide the same testimony" (quotations and citation omitted)); *Clifford P.D. Redekop Fam. LLC v. Utah Cnty. Real Est. LLC*, 2016 UT App 121, ¶ 19, 378 P.3d 109 (stating that "expert testimony *is necessary* in cases where the jury would be unable to determine the applicable standard of care without resulting to speculation" (emphasis in original) (quotations and citations omitted)).

[155] *White v. Jepson*, 2014 UT App 90, ¶¶ 21-22, 325 P.3d 888.

To determine the elements of this claim, the court considers Model Utah Jury Instruction CV 2119, which applies to the implied covenant of good faith and fair dealing. This instruction provides in relevant part:

> All contracts contain an unwritten or implied promise that the parties will deal with each other fairly and in good faith. This means that [plaintiff] and [defendant] have promised not to intentionally do anything to injure each other's right to receive the benefits of the contract. To decide if [defendant] violated this unwritten promise, you should consider whether [its] actions were consistent with the agreed common purpose and justified expectations of [plaintiff] in light of the contract language and the dealings between and conduct of the parties.
>
> There are some limits to this unwritten promise that you need to keep in mind.
>
> First, this unwritten promise between the parties to deal fairly with each other and in good faith does not establish new, independent rights or duties that [plaintiff] and [defendant] did not agree to.
>
> Second, this unwritten promise does not create rights and duties that are inconsistent with the actual terms of the contract.
>
> Third, this unwritten promise does not require either party to use a contract right in a way that will be harmful to themselves simply to benefit the other party.
>
> Finally, you cannot use this unwritten promise to achieve an outcome that you believe is fair but is inconsistent with the actual terms of the contract.[156]

The crux of the inquiry that each juror must make in a bad faith claim is whether either party "intentionally" did something to injure the other party's right to benefits under the contract. In making this call, the jury cannot add new or contradictory terms to the contract and cannot

---

[156] Model Utah Jury Instructions (2nd ed.), CV2119.

require the party to use the contract to its detriment. Asking a jury to determine whether one party intentionally took action to injure the other party's rights under a contract is not the stuff of expert opinion. Indeed, juries in criminal cases are asked daily to determine whether a defendant intentionally sought to harm someone else without the benefit of expert testimony.[157] Consequently, the elements of the claim do not appear to require expert testimony.

Courts from Utah and other states do not undermine this conclusion. Although Utah courts have not opined specifically on whether a plaintiff alleging bad faith in an insurance claim must rely on an expert, the Utah Supreme Court said that an insurer's duty of good faith "requires the insurer to deal with laymen as laymen and not as experts in the subtleties of law and underwriting and to refrain from actions that will injure the insured's ability to obtain the benefits of the contract."[158] Given the Utah Supreme Court's statement, there is a logical incongruence in Progressive's argument that Ms. Baker must produce an *expert* to opine on whether Progressive adequately dealt with a *layperson as a layperson*. Indeed, determining whether a company appropriately dealt with a layperson as a layperson seems like a fitting task for a layperson, not experts.

Moreover, the court cannot find a single jurisdiction in the United States that currently requires expert testimony to prove a bad faith insurance claim.[159] Instead, the overwhelming

---

[157] Fed. R. Evid. 704(b) (precluding expert testimony on defendant's mental state or condition that is an element of the offense because that issue is "for the trier of fact alone").

[158] *Beck*, 701 P.2d at 801 (quotations and citations omitted).

[159] The Wisconsin Court of Appeals appears to have held that expert opinion was required for bad faith insurance claims in *Heyden v. Safeco Title Ins. Co.*, 498 N.W.2d 905 (Wis. Ct. App. 1993). However, the Wisconsin Supreme Court expressly overruled that decision and held that expert opinion was not necessarily required in the bad faith insurance context. *Weiss v. United*

weight of authority is to the contrary because determining the adequacy of an insurance

company's investigation and claims processing is within the ken of the average juror.[160]

       Although theoretically possible that a bad faith insurance claim could require expert

testimony under the appropriate circumstances,[161] such circumstances are not present here.

Indeed, Progressive cites no factual circumstance here that is so complex as to warrant an expert.

In fact, Progressive merely states that Ms. Baker's expert needs to opine on "proper

---

*Fire & Cas. Co.*, 541 N.W.2d 753, 759 (Wis. 1995) ("To the extent that *Heyden* establishes a contrary rule, it is hereby overruled.").

[160] *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994) (affirming district court's exclusion of plaintiff's expert at trial whose testimony would have been "to compare State Farm's actions to the industry standard and the laws of the State of Oklahoma" in bad faith insurance action because jury was capable of assessing issue itself and expert testimony "would not even marginally assist the trier of fact" (quotations and citation omitted)); *Selective Ins. Co. of S.C. v. Sela*, 455 F. Supp. 3d 841, 856 n.15 (D. Minn. 2020) ("Assessing the reasonableness of Selective's investment and its denial of Sela's claim is certainly not 'so esoteric' that the court needs the assistance of an expert witness"); *Tracey v. Am. Fam. Mut. Ins. Co.*, No. 2:09-CV-1257-GMN-PAL, 2010 WL 3724896, at *4 (D. Nev. Sept. 17, 2010) ("[T]here is considerable authority from other jurisdictions to the effect that expert testimony is not generally required to establish bad faith or other improper handling of claims."); *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 345 (Colo. 2004) (holding that expert testimony not required in bad faith insurance claim because "[t]he reasonableness of an insurer's investigation into the underlying events of an automobile insurance claim is not a technical question and does not require additional professional training beyond the knowledge of the average juror."); *Bergman v. United Servs. Auto. Ass'n*, 742 A.2d 1101, 1106-07 (Pa. Super. Ct. 1999) (recognizing that "[o]ur examination of case law from other jurisdictions reveals a growing trend among the states in favor of holding that expert testimony is not mandated in all bad faith cases" and holding that expert testimony is not required as a *per se* rule in bad faith actions); *Weiss v. United Fire & Cas. Co.*, 541 N.W.2d 753, 759 (Wis. 1995) (holding that bad faith insurance claim at issue regarding adequacy of company's investigation of claim did not require expert testimony because the issue was "within the common knowledge and ordinary experience of an average juror" and "did not involve complex or technical knowledge of the insurance industry or industry practices"); *New York v. Merchs. Ins. Co. of N.H.*, 486 N.Y.S.2d 412, 414 (N.Y. App. Div. 1985) (holding plaintiff did not have to produce an expert to testify as to accepted standard in the insurance industry for settlement practices and procedures because the jury was qualified to draw its own conclusions).

[161] *Bergman*, 742 A.2d at 1106-07 (recognizing that expert witness may be necessary under facts of certain cases but is not a *per se* necessity in bad faith insurance cases).

claims-handling procedures, industry standards, and best practices."[162] However, these topics are the very things that are within a layperson's ability to properly assess. In fact, these are the subjects that the Court of Appeals for the Tenth Circuit previously said "would not even marginally assist the trier of fact" in a bad faith insurance case.[163] Thus, under the circumstances of this action, Ms. Baker was not required to produce an expert to maintain her bad faith claim.

CONCLUSION AND ORDER

As shown above, Progressive has failed to show both that Ms. Baker's UIM claim was fairly debatable as a matter of law and that she was required to rely on expert testimony to support her bad faith claim. However, Progressive *is* entitled to summary judgment because Ms. Baker has failed to establish the fact of damages. Therefore, Progressive's motion for partial summary judgment regarding Ms. Baker's third and fourth causes of action[164] is GRANTED, and those two causes of action are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

DATED this 21st day of April 2023.

BY THE COURT:

JARED C. BENNETT
United States Magistrate Judge

---

[162] ECF No. 29 at 23 of 25; *see also* ECF No. 34 at 15 of 20.

[163] *Thompson*, 34 F.3d at 941 (quotations and citation omitted).

[164] ECF No. 29.